United States District Court
Southern District of Texas

**ENTERED**

January 24, 2018

David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| EUGENIO PEDRAZA, | § | |
|     Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 1:17-86 |
| | § | Criminal No. B:13-305-1 |
| UNITED STATES OF AMERICA, | § | |
|     Respondent. | § | |

### REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

On April 20, 2017, Petitioner Eugenio Pedraza filed a Motion to Vacate, Set Aside, or Correct his Sentence pursuant to 28 U.S.C. § 2255. Dkt. No. 1. On July 5, 2017, the Government filed a response to the motion. Dkt. No. 15. On October 20, 2017, Pedraza timely filed a reply brief. Dkt. Nos. 21, 22.

After reviewing the record and the relevant case law, the Court recommends that the petition be dismissed as procedurally defaulted. Pedraza did not raise these claims on direct appeal and cannot establish cause and prejudice for his failure to do so. Even if the claims are not procedurally defaulted, they should be denied as meritless.

## I. Background

### A. Indictment

On April 9, 2013, Pedraza was indicted and charged with one count of conspiracy to falsify records in federal investigations and obstruct justice, in violation of 18 U.S.C. § 371; six counts of falsification of records in federal investigations, in violation of 18 U.S.C. § 1519; five counts of obstruction of a federal agency proceeding, in violation of 18 U.S.C. § 1505; and one count of obstruction of justice in violation of 18 U.S.C. § 1512(c)(1). U.S. v. Pedraza, Criminal No. 13-305-1, Dkt. No. 1 (hereafter "CR"). The Court dismissed all five counts of obstruction of a federal agency proceeding prior to trial, after a defense motion. CR Dkt. No. 193.

1

**B. Trial**

On March 14, 2014, Pedraza's jury trial began. CR Dkt. No. 147.  The testimony showed that Pedraza was the special agent in charge ("SAC") for the Department of Homeland Security's Office of Inspector General ("DHS-OIG") in McAllen, Texas. Id, p. 126.  At the time that Pedraza was suspended from that position, in February 2012, there were seven DHS-OIG agents directly reporting to him. Id, p. 131.

The job of the DHS-OIG agents was to investigate allegations of fraud, waste, abuse, public corruption and other criminal allegations against DHS employees, including law enforcement agents. CR Dkt. No. 148, p. 8.

The Government's theory of the case was that Pedraza learned that his office was to undergo an internal inspection in September 2011, to determine whether sufficient progress was being made on cases.  To ensure that his office would pass the inspection, Pedraza instructed his agents to falsify internal investigation records to make it appear that more progress was being made than had actually taken place. CR Dkt. No. 147, pp. 98-110.

During voir dire, the jury was informed that DHS-OIG agent Marco Rodriguez, among others, might be a witness for the Government; this was done to ensure that none of the potential jury members knew any witness or attorney in the case. CR Dkt. No. 147, p. 29. Rodriguez had been indicted as a co-conspirator with Pedraza, but the Government moved to dismiss those charges prior to trial. CR Dkt. No. 102.  Rodriguez did not testify at trial and Pedraza asserts that Rodriguez was reinstated to his former DHS-OIG position at some point after the trial had been completed.

As relevant here, three agents who worked under Pedraza – Robert Vargas, Rolando Gomez, and Edwin Castillo– testified about Pedraza's instructions to them relating to  the inspection. CR Dkt. No. 148, p. 91; CR Dkt. No. 149, pp. 71, 172.[1]

---

[1] Other witnesses testified at trial, but Pedraza's claims center around Vargas, Gomez and Castillo.  Because only the testimony of these witnesses is relevant to the issues presented by the § 2255 petition, the Court addresses only their testimony.  By not raising any other claims of error in his briefing, Pedraza has waived them. Mid-Continent Cas. Co. v. Bay Rock Operating Co., 614 F.3d 105, 113 (5th Cir. 2010).

### 1. Vargas

Vargas testified that he had been assigned a case in which a Customs agent had been "suspected of narcotics and human smuggling through the bridge for the Mexican Cartel." CR Dkt. No. 148, p. 123.  Vargas testified that the case was opened with DHS-OIG in March 2010 and it was assigned to Vargas in June 2011. Id, p. 124.  Vargas testified that there were no internal investigative reports[2] in the file that showed that any work had been done on the case between March 2010 and June 2011. Id, pp. 124-25.  After receiving the case, Vargas testified that he had done initial investigative work and was planning to record those efforts in the file. Id., Dkt. Nos. 129-31.

Despite the fact that Vargas was not even employed by DHS-OIG during the period between March 2010 and June 2011, Pedraza specifically instructed Vargas to create false reports of activity for that period.  Id, p. 133.  Vargas testified that when he and another agent took their concerns to Wayne Ball, a senior agent in the office, Ball replied, "Fuck you. Do it," which Vargas testified that he understood to mean, "follow the orders, falsify those records." CR Dkt. No. 148, p. 150.  Vargas testified that he wrote false reports for Ball's signature. Id, pp. 150-55.

Vargas testified that he reported his involvement in the creation of the false records to James Izzard, one of the inspectors who was conducting the inspection. Id, p. 155.  During the inspection, which was conducted in September 2011, Izzard asked Vargas if he had "ever been asked to do anything [he] believed [. . .] was unethical, illegal, such as fabricating or making up reports?" CR Dkt. No. 148, p. 160.  Vargas replied that he had and, at that point, reported what Pedraza had instructed him to do.  Id, p. 162. Izzard instructed Vargas to write up a report documenting Pedraza's actions.  Id.

Vargas testified that he was placed on administrative leave, with pay, in May 2012 for the creation of the false reports and remained on administrative leave when he testified at

---

[2] These internal investigative reports are also referred to as memoranda of activity ("MOA"). CR Dkt. No. 148, p. 125.

Pedraza's trial in March 2014. CR Dkt. No. 148, pp. 91, 174.  Vargas testified that he had an agreement with the Government that, in exchange for his truthful testimony, he would not be prosecuted for his role in creating the false reports. CR Dkt. No. 148, pp. 174-76.

Vargas was further asked about his continued employment with DHS-OIG:

[PROSECUTOR] Is it possible that for what you're testifying about today, you could ultimately lose your job with the Department of Homeland Security?

[VARGAS] Yes.

[PROSECUTOR] Have any promises been made to you by prosecutors from the government about your employment?

[VARGAS] No.

[PROSECUTOR] Have any of the prosecutors told you they'll put in a good word for you with DHS if you testify at trial?

[VARGAS] No.

[PROSECUTOR] Have any of the prosecutors you met with have authority to rehire you with DHS?

[VARGAS] No.

[PROSECUTOR] Are any of the prosecutors that you've met with even employed by DHS?

[VARGAS] Not that I'm aware of, no.

[PROSECUTOR] Just so we're clear, do I have anything to do with whether you're going to get your job back?

[VARGAS] No.

[PROSECUTOR] Does Mr. Kidd [fellow prosecutor] seated at counsel table have anything to do with whether you're going to get your job back?

[VARGAS] No.

CR Dkt. No. 148, pp. 176-77.

On cross-examination, Vargas was asked if he thought he was "going to get [his] job back." CR Dkt. No. 148, p. 196. Vargas replied, "I said I don't know. It's not in my hands, but I'm going to play it out." Id.

## 2. Gomez

Gomez testified that he had been assigned a case involving " a corrupt Customs inspector at the Brownsville port of entry that was facilitating the smuggling of illegal aliens into the United States." CR Dkt. No. 149, p. 73. A confidential informant ("CI") was utilized in the investigation; the CI was a Mexican citizen who was given temporary legal status to permit her to assist the investigation. Id, pp. 76-77.

In April 2011, Pedraza ordered Gomez to "deactivate" the CI, which meant that the CI would lose her legal status in the United States and that she would be deported to Mexico by DHS-OIG agents. CR Dkt. No. 149, pp. 75-76. Gomez met with the CI to deactivate her, after which, two other DHS-OIG agents deported the CI to Mexico; Gomez did not personally accompany the CI to Mexico. Id, p. 79. In his report, Gomez accurately stated that the other agents returned the CI to Mexico. Id, p. 81.

When Gomez submitted a draft of his report, Pedraza directed him to change the report, so that it reflected that Gomez personally returned the CI to Mexico. CR Dkt. No. 149, pp. 82-83. When Gomez asked why this edit needed to be made, Pedraza said that Gomez "had to put [his] name in the report, in the memorandum of activity because [the CI] was [his] source, and that's how headquarters wanted it." CR Dkt. No. 185, p. 85. Gomez complied, because, one, he "didn't want to be disciplined for insubordination. And, two, [Pedraza] was the type of manager that will hold things against you and couldn't – you know, would make your life miserable if you didn't go by what he wanted. He didn't like to be told no." Id, pp. 85-86.

In January 2012, Gomez was contacted by "an individual claiming he was an attorney representing" the CI and wanting the phone number for Gomez's supervisor. CR Dkt. No.

149, p. 91-92.  Gomez informed his supervisor – who was Pedraza's successor – of the phone call and of the inaccuracy in the report. Id, pp. 92-93.

Gomez was later placed on administrative leave, with pay, and remained in that status at the time that he testified at Pedraza's trial. CR Dkt. No. 149, p. 93.

In his testimony, Gomez admitted that he had an agreement with the prosecutors that in exchange for his truthful testimony, he would "not be prosecuted for any criminal offenses arising from [his] participation in falsifying documents." CR Dkt. No. 149, pp. 93-94.

On cross-examination, Gomez was asked "[i]s it your hope at the end of your testimony that you're going to get your job back?" CR Dkt. No. 149, p. 96.  Gomez replied, "I hope the agency does the right thing and returns me back to work." Id.  On redirect, Gomez stated that the prosecution "made it clear from the very beginning that they have no bearing as to what is going to happen with my job." CR Dkt. No. 149, p. 171.

### 3. Castillo

Castillo was assigned to investigate a case of an unknown Customs and Border Patrol agent, who selling fraudulent immigration papers to illegal immigrants. CR Dkt. No. 149, pp. 175-76. According to Castillo, the case originated from a tip that a border crosser gave to a different Border Patrol agent.  Id.

Castillo testified that Pedraza came into his office and said that he needed a favor from Castillo. CR Dkt. No. 149, pp. 176-77.  The favor was for Castillo to draft an investigative report for the fraudulent immigration papers case; further, Pedraza "told me more or less what he wanted on it." Id.  Castillo stated that he drafted the requested document and emailed it to Pedraza, even though he had not conducted any of the investigative activity discussed in the document. Id.  Castillo also created a document that officially closed the investigation. CR Dkt. No. 149, pp. 178-80.  The investigative report was dated January 19, 2010, even though Castillo testified that he authored the report in February 2011. Id, p. 182.

During the September 2011 inspection, Castillo met with Izzard. CR Dkt. No. 149, p. 186.  Izzard was asking if "the office was running smoothly, morale, asking about

6

operations within the office, how the office was being run." Id.  When Izzard brought up those topics, Castillo told him "that there was a document that [...] should be looked at." Id. Castillo provided him with a copy of the investigative reports that Pedraza had asked him to write. id.  Izzard was "shocked" and asked Castillo to send him an email outlining the story of how the report was created. Id, p. 187.  Castillo was subsequently placed on administrative leave, with pay, and remained in that status at the time of Pedraza's trial. Id, p. 173.

At Pedraza's trial, Castillo testified that in exchange for his truthful testimony, the Government agreed that he would not be prosecuted for drafting a falsified report or signing a falsified report. CR Dkt. No. 149, pp. 195-96.   Castillo further testified that the Government had made no promises about whether he would get his job back or whether the Government would endorse him getting his job back. Id, pp. 195-97.  Instead, he testified that "my agency [meaning DHS-OIG] is going to decide what happens" with regard to his continued employment. Id.

### 4. Verdict and Sentencing

At the conclusion of the trial, the jury found Pedraza guilty of one count of conspiracy to falsify records in federal investigations and obstruct justice (Count 1) and five counts of falsifying federal records (Counts 2, 4, 6, 10, 11) . CR Dkt. No. 136.  The jury found Pedraza not guilty of obstruction of justice (Count 13)  and one count of falsifying federal records (Count 12). Id.

In the final presentence report ("PSR"), Pedraza was assessed a base offense level of 14. CR Dkt. No. 155, pp. 22-23.[3]  He was assessed a three-level enhancement because his offense "resulted in substantial interference with the administration of justice." Id.  He was assessed an additional two-level enhancement because his offense "involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects." Id.  Pedraza was also assessed a three-level enhancement, because he was deemed to be "a

---

[3]  Pursuant to U.S.S.G. § 3D1.2(b), all of the counts of conviction were grouped together because the offenses all involved the same victim and two or more transactions that were part of a common scheme or plan. CR Dkt. No. 155, pp. 22-23.

manager/supervisor of a criminal activity that involved five (5) or more participants." Id.
Pedraza also was assessed a two-level enhancement, because he "abused a position of trust
which significantly facilitated the commission or concealment of the offense." Id.  Lastly,
Pedraza was assessed a two-level enhancement because he "willfully obstructed or impeded
the administration of justice during the course of the investigation of the instant offense." Id.
Accordingly, his total offense level was 26.  Id.  Pedraza had no criminal convictions,
resulting in no criminal history points and a criminal history category of I. CR Dkt. No. 155,
p. 24.  Based upon a total offense level of 26 and a criminal history category of I, Pedraza's
guideline imprisonment range was 63 to 78 months. CR Dkt. No. 155, p. 29.

At sentencing, the Court granted Pedraza's objections to the enhancements for
"substantial interference with the administration of justice," and obstruction of the
administration of justice, reducing Pedraza's total offense level by five points. CR Dkt. No.
191, pp. 11-12, 24-25.  Thus, Pedraza's total offense level was revised to 21 and his criminal
history category remained at I. Id, pp. 24-25.  Pedraza's new sentencing guideline range was
37 to 46 months. Id, pp. 25-26.

On December 15, 2014, the Court sentenced Pedraza to 37 months imprisonment, two
years of supervised release, a $7,500 fine and a $600 special assessment. CR Dkt. No. 191,
pp. 41-43.  The judgment was entered on February 25, 2015. CR Dkt. No. 193.

On April 28, 2015 – after the judgment was entered, but before the direct appeal was
filed – Pedraza filed an emergency motion for discovery regarding the reinstatement of
Vargas, Gomez, Castillo, and Rodriguez to their federal employment. CR Dkt. No. 200.
Pedraza argued that the timing of the reinstatements "suggests" that the agents were
reinstated for testifying against Pedraza. Id.  Pedraza also argued that the reinstatement meant
that DHS-OIG concluded that the reinstated agents' conduct was not criminal, which,
according to Pedraza's theory, meant that the agency did not believe that Pedraza's actions
were criminal. Id.

On April 30, 2015, the Government filed a response, which stated that there were no
promises made to Vargas, Gomez, Castillo, or Rodriguez regarding their reinstatement to

their former positions. CR Dkt. No. 203.  The response included a sworn declaration from Andrew G. Oosterbaan, the assistant inspector general for investigations, that "the Department of Justice was not consulted regarding" the reinstatement of Vargas, Gomez, Castillo or Rodriguez, and "provided no input in these administrative decisions." CR Dkt. No. 203-1.  Oosterbaan also stated that "no promises were made" and "no agreements were entered into" between DHS-OIG and Rodriguez, Gomez, Vargas, or Castillo regarding the outcome of their reinstatement proceedings. Id.  Oosterbaan stated that DHS-OIG was "solely responsible for the decisions" made to reinstate the agents. Id.  Thus, Oosterbaan explicitly affirmed that neither DHS-OIG nor the Department of Justice made any promises to Rodriguez, Gomez, Vargas or Castillo regarding their potential reinstatement.

On May 1, 2015, the Court denied Pedraza's motion. CR Dkt. No. 205.[4]

### C. Direct Appeal

Pedraza timely filed a notice of direct appeal.  On appeal, Pedraza argued that the district court abused its discretion by excluding a DHS-OIG inspector's report from evidence. CR Dkt. No. 212.  The subject report contained the opinion of the assistant inspector general that the fabricated reports were based on a "misunderstanding" between Pedraza and his subordinates. Id.  Pedraza also asserted that he was entitled to dismissal of some of the claims against him because the relevant statute – 18 U.S.C. § 1519 – did not criminalize "attempts to impede the internal policies and processes of an agency." Id.  Pedraza further challenged the sufficiency of the evidence as to some of his convictions. Id.

On January 22, 2016, the Court of Appeals for the Fifth Circuit affirmed all of Pedraza's convictions. CR Dkt. No. 212.  The Appeals Court found that the district court did not abuse its discretion in excluding the report and stated that "even if the [district] court erred by excluding [the] report, there is no indication that the report would have a substantial

---

[4] The Court notes that Pedraza's brief in his direct appeal was not filed until May 26, 2015, three weeks after the District Court denied Pedraza's motion for discovery. U.S. v. Pedraza, Case No: 14-41450 (5th Cir. 2015).  Despite the District Court's ruling, the issues raised in his motion for discovery were not raised in his direct appeal. Id.

impact on the jury's verdict." <u>Id</u>.  The Court further found that the "plain language" of 18 U.S.C. § 1519 – criminalized attempts to impede an agency's internal processes. <u>Id</u>.  Lastly, the Fifth Circuit found that the evidence sufficiently supported the verdict. <u>Id</u>.

Neither the Fifth Circuit docket nor the Supreme Court of the United States docket reflect the filing of a petition for a <u>writ</u> <u>of</u> <u>certiorari</u> with the Supreme Court.

Pedraza had 90 days from the Fifth Circuit's decision – until April 21, 2016 – to file a petition for a <u>writ</u> <u>of</u> <u>certiorari</u> with the Supreme Court. S.CT. RULE 13.  Pedraza's conviction became final when the deadline expired, <u>i.e.</u>, April 21, 2016. <u>U.S. v. Olvera</u>, 775 F.3d 726, 729 (5th Cir. 2015) ("A judgment of conviction becomes final under § 2255(f)(1) when the Supreme Court affirms a conviction on the merits on direct review or denies a petition for a <u>writ</u> <u>of</u> <u>certiorari</u>, or when the time for filing a <u>certiorari</u> petition expires.") (internal quotations omitted).

### D. <u>Habeas</u> Petition

On April 20, 2017, Pedraza timely filed a motion pursuant to 28 U.S.C. § 2255, requesting that the District Court vacate, set aside, or correct his sentence. Dkt. No. 1. Pedraza raises three claims in support of his petition: (1) whether the Government failed to inform Pedraza that Vargas, Gomez, and Castillo received implicit or explicit promises that they would be reinstated to their former positions in exchange for their testimony; (2) whether the Government failed to inform Pedraza that Rodriguez was given an explicit or implicit promise that he would be reinstated to federal employment "in exchange for absenting himself from Pedraza's trial"; and, (3) the jury was not allowed to hear that DHS-OIG, the Justice Department or the FBI did not believe that Vargas, Castillo, Rodriguez, or Gomez committed any violations of federal law.  According to Pedraza, the third claim argues that DHS-OIG believed that Pedraza's co-conspirators never committed a crime, despite the fact that Pedraza was convicted based upon their actions.Dkt. No. 1.

On July 5, 2017, the Government filed a timely response to Pedraza's petition. Dkt. No. 15.   The Government argued that there is no evidence in the record that any

governmental entity made any promises to Vargas, Gomez, Castillo, or Rodriguez, and that Pedraza has not submitted any evidence to show such promises. Id.

On July 11, 2017, the Court issued an order, which noted that Pedraza was represented in the instant petition by the same attorneys who represented him at trial and on direct appeal and that the petition did not raise any possible issues of ineffective assistance of counsel. Dkt. No. 16.  The Court noted that there was a possible conflict of interest between Pedraza and his attorneys, because his attorneys had a professional interest in not claiming that Pedraza was denied effective assistance of counsel. Id.  The Court ordered the parties to brief the issue of whether such a conflict existed and how to cure the conflict. Id.

Pedraza and the Government filed responses, recognizing the potential conflict and agreeing that the best way to cure the conflict was to appoint outside counsel to consult with Pedraza about any possible ineffective assistance of counsel claims. Dkt. Nos. 17, 18.

On August 16, 2017, the Court appointed David Willis to represent Pedraza for the limited purpose of advising Pedraza about the existence of any possible ineffective assistance of counsel issues; the likelihood of success of any such claims; and to counsel Pedraza that the instant petition would likely be his only opportunity to raise such claims. Dkt. No. 19.

On October 5, 2017, the Court held an evidentiary hearing, where Pedraza informed the Court that he had spoken with Willis and was satisfied with the advice that Willis had given him.  Pedraza further informed the Court that after discussing the matter with Willis, he had chosen to forgo any possible claims for ineffective assistance and desired to be represented by his current counsel.  The Court found that Pedraza had knowingly and intelligently waived any possible claims of ineffective assistance of counsel against his current attorneys and allowed him to proceed with his chosen counsel.[5]

On October 20, 2017 – after the Court resolved the inquiry regarding any ineffective assistance of counsel claims – Pedraza filed a timely reply. Dkt. Nos. 21, 22.

---

[5]  The Court emphasizes that the appointment of Willis was a purely prophylactic measure designed to ensure that any possible conflict of interest was addressed.  It was not based upon any belief that Pedraza had received ineffective assistance of counsel.

## II. Applicable Law

### A. Section 2255

Pedraza seeks relief pursuant to 28 U.S.C. § 2255. Dkt. No. 1. That section provides, as relevant here:

> (a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). Pedraza has been released from prison and is currently on supervised release. Dkt. No. 17. That status satisfies the "custody" requirement of § 2255(a). Pack v. Yusuff, 218 F.3d 448, 454 n. 5 (5th Cir. 2000).

After a petitioner's conviction becomes final, the Court is entitled to presume that he stands fairly convicted. U.S. v. Frady, 456 U.S. 152, 164 (1982); U.S. v. Willis, 273 F.3d 592, 595 (5th Cir. 2001). A petitioner who seeks to challenge a final conviction by collateral attack, can do so on constitutional or jurisdictional grounds. 28 U.S.C. § 2255(a); U.S. v. Shaid, 937 F.2d 228, 233 (5th Cir. 1991) (en banc).

Generally, a petitioner may not raise on collateral attack issues that he failed to raise on direct appeal, "without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." Shaid, 937 F.2d at 232. "A defendant must meet this cause and actual prejudice test even when he alleges a fundamental constitutional error." Id.

Cause is established by showing that "some objective factor external to the defense" prevented him from raising the issue on direct appeal. U.S. v. Reedy, 393 F. App'x 246, 247 (5th Cir. 2010) (unpubl.) (citing U.S. v. Guerra, 94 F.3d 989, 993 (5th Cir.1996)). Furthermore, actual prejudice requires that the defendant "shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions." <u>Frady</u>, 456 U.S. at 170 (emphasis original).  The cause and prejudice standard "presents a significantly higher hurdle than the plain error standard of review that is applied on direct appeal." <u>U.S. v. Young</u>, 77 F. App'x 708, 709 (5th Cir. 2003).[6]

Furthermore, "[c]hallenges to issues decided on direct appeal are foreclosed from consideration in a § 2255 motion." <u>U.S. v. Fields</u>, 761 F.3d 443, 463 n. 12 (5th Cir. 2014), <u>as</u> <u>revised</u> (Sept. 2, 2014), <u>cert</u>. <u>denied</u>, 135 S. Ct. 2803, 192 L. Ed. 2d 847 (2015) (citing <u>U.S. v. Kalish</u>, 780 F.2d 506, 508 (5th Cir. 1986)).

## III. Analysis

A court may entertain and decide a § 2255 motion without requiring the production of the petitioner at a hearing. 28 U.S.C. § 2255.  Further, a district court may deny a § 2255 motion without an evidentiary hearing "only if the motion, files, and records of the case conclusively show the prisoner is entitled to no relief." <u>U.S. v. Bartholomew</u>, 974 F.2d 39, 41 (5th Cir. 1992).  The record in this case satisfies this requirement, for which reason the motion can be decided without a hearing.

Pedraza's claims revolve around the reinstatement of his subordinates – Vargas, Gomez, Castillo, and Rodriguez – to their employment positions after Pedraza's jury trial. Pointing to no evidence whatsoever, Pedraza argues that there must have been an implicit or explicit agreement to reinstate them in exchange for their cooperation and that these agreements were withheld from the defense and the jury.

---

[6] The only exception to the cause and prejudice standard is when "a constitutional violation has probably resulted in the conviction of one who is actually innocent" of the crime. <u>Murray v. Carrier</u>, 477 U.S. 478, 496 (1986).  This standard requires evidence that the defendant did not commit the crime for which he was convicted. <u>Id</u>.  In this case, the Fifth Circuit has already ruled that there is sufficient evidence to support Pedraza's convictions. CR Dkt. No. 212.  As discussed further below, Pedraza has not shown that he is actually innocent.

As an initial matter, Pedraza's claims are procedurally defaulted, because he had the opportunity to raise them on direct appeal and failed to do so.[7]  On the other hand, even if the claims are not procedurally defaulted, they are meritless and entitle Pedraza to no relief.

**A. Procedural Default**

As previously noted, a petitioner cannot raise an issue for the first time in a <u>habeas</u> proceeding, if he had the opportunity to raise it on direct appeal and failed to do so. <u>Shaid</u>, 937 F.2d at 233.  All of the issues raised in the instant petition – regarding Rodriguez, Vargas, Gomez, and Castillo possibly having an explicit or implicit agreement with the Government to return to their jobs in exchange for their cooperation; and whether DHS-OIG believed that what Pedraza did was actually a crime – were raised in Pedraza's post-trial motion for discovery. CR Dkt. No. 200.  That motion was denied on May 1, 2015. CR Dkt. No. 205.

Pedraza's brief in his direct appeal was filed on May 26, 2015. <u>U.S. v. Pedraza</u>, Case No: 14-41450 (5th Cir. 2015).  Pedraza could have raised the purported agreement and noncriminal conduct issues on direct appeal, but did not do so.  Therefore, his claims are procedurally defaulted in these proceedings, unless he can show cause and prejudice from his failure to raise them. <u>Shaid</u>, 937 F.2d at 233.

In order to establish cause, Pedraza must show that some "objective factor external to the defense" caused Pedraza's attorneys to be unable to raise the issue before the appellate court. <u>Reedy</u>, 393 F. App'x at 247; <u>Fairman v. Anderson</u>, 188 F.3d 635, 643 (5th Cir. 1999).  In this case, no external factors prevented Pedraza's counsel from raising the same arguments

---

[7] While the Government did not raise the issue of procedural default, the Court is entitled to raise it <u>sua sponte</u>. <u>U.S. v. Willis</u>, 273 F.3d 592, 596 (5th Cir. 2001).  The Court should give notice to the parties that "procedural default will be an issue for consideration." <u>Id</u>.  The Fifth Circuit has held that "magistrate judge's report and recommendation to the district judge alerting the parties that procedural default would be at issue" suffices for notice. <u>Prieto v. Quarterman</u>, 456 F.3d 511, 518-19 n. 34 (5th Cir. 2006).  Thus, the parties should consider this report and recommendation as notice that the District Court is considering whether Pedraza has procedurally defaulted his claims in this case.

before the Fifth Circuit that were raised in the motion for discovery. The basic underlying facts – that Rodriguez, Vargas, Gomez, and Castillo were reinstated to federal employment shortly after Pedraza's trial – were known to Pedraza and his counsel at the time of his direct appeal. Nothing prevented Pedraza's counsel from arguing on direct appeal that the reinstatements meant that the Government had violated its obligations under Giglio v. U.S., 405 U.S. 150 (1972).[8]

Even if Pedraza had shown cause for his failure to raise the issues on direct appeal, he must also establish actual prejudice. Notably, he must demonstrate that the errors he complained of "worked to his actual and substantial disadvantage" rather than just creating "a possibility of prejudice." Frady, 456 U.S. at 170 (emphasis original). Even if the Court assumes – for the sake of argument – that there was a reinstatement agreement between the Government and its witnesses, Pedraza cannot show that the alleged failure to disclose such an agreement prejudiced him.

If these agreements existed, the Government would have been required to disclose them to Pedraza. Derden v. Hargett, 192 F.3d 126 (5th Cir. 1999) ("A promise of leniency made to a key witness in return for his testimony is impeachment evidence to which a defendant is entitled."). That fact, however, does not end the inquiry.

"In order to establish a Giglio claim, a habeas petitioner must show that 1) the state withheld evidence; 2) the evidence was favorable; and, 3) the evidence was material to the defense." Derden, 192 F.3d at *3. Assuming the agreements existed, Pedraza would meet the first two requirements, that the evidence was withheld and was favorable to the defense. To satisfy the final requirement – materiality – Pedraza would have to show that there is a

---

[8] Ineffective assistance of counsel would satisfy the cause and prejudice standard. U.S. v. Carter, 114 F.3d 1184 (5th Cir. 1997). Pedraza, however, expressly disclaimed – under oath – any ineffective assistance of counsel claims at the October 5, 2017 evidentiary hearing about such claims. Moreover, even if such a claim were not affirmatively foreclosed, it would entitle him to no relief, because the underlying claims are meritless and the arguments would have been futile. Koch v. Puckett, 907 F.2d 524, 527 (5th Cir.1990) ("counsel is not required to make futile motions or objections.").

"reasonable probability" that the result of the trial would have been different. <u>U.S. v. Bagley</u>, 473 U.S. 667, 682 (1985). Pedraza has not made this showing.

The Court first notes that "when the undisclosed evidence is merely cumulative of other evidence," the defendant cannot meet the reasonable probability standard. <u>Derden</u>, 192 F.3d at *3 (quoting <u>Spence v. Johnson</u>, 80 F.3d 989, 995 (5th Cir. 1996)).

The issue of whether Vargas, Gomez, and Castillo were motivated to testify against Pedraza, in exchange for being reinstated, was fully explored at trial. Each of those witnesses was questioned on cross-examination about whether they expected to be reinstated if they testified against Pedraza. CR Dkt. No. 148, pp. 176-77, 196; CR Dkt. No. 149, pp. 93-96, 171, 195-97. Furthermore, in closing argument, defense counsel told the jury that Gomez and Vargas should not be believed, because "I don't see how you can believe somebody that has been bought and paid for in that manner beyond a reasonable doubt." CR Dkt. No. 151, pp. 88-89. The entire defense theory of the case was that Gomez and Vargas made "their own mistakes" and were "trying to save themself by placing blame on Gene Pedraza." <u>Id</u>. Defense counsel argued concerning Gomez and Vargas:

> And both of those guys, after they admit, they say they did something wrong, they think they want their law enforcement jobs back? Well, they're hoping that they're going to have help getting that job back. Who do you think they're going -- is going to jump in and help them get that job back? They're hoping they get rewarded, from their minds, rewarded for their testimony in this courtroom of getting Gene Pedraza.

CR Dkt. No. 151, p. 88.

Evidence of an actual agreement would have been helpful to the defense, but largely cumulative of the other attacks made on the credibility of those witnesses. <u>Derden</u>, 192 F.3d 126, *3 (defendant was not entitled to relief under <u>Giglio</u> when counsel "had already spent much effort" attacking the witness's credibility and willingness to lie based on a possible agreement with the prosecution). Indeed, while the existence of a purported agreement would have bolstered the defense's arguments, the idea that Gomez and Vargas were trying to sacrifice Pedraza in order to save their own skin was fully explored at trial.

The Court notes that any evidence of an agreement between the Government and Castillo would not have much impact, largely because of defense counsel's tactical decisions. On cross-examination, counsel asked Castillo if it was possible "that maybe you've been wrong all along" about how he, Castillo, characterized his conversations with Pedraza. CR Dkt. No. 149, p. 210. Castillo said, "I mean, I could have [. . .] I don't know." Id.

During closing argument, defense counsel characterized Castillo's response to that question by arguing:

> "he swallowed hard and he thought. And I guarantee you the thought that was going through his mind was not just my question and what his answer was, but whether his answer would violate his immunity agreement, because it would be backing off saying something bad about Gene Pedraza and was afraid they would jerk his immunity out from under him and he would be prosecuted. But I give that young man credit because he told you the truth. He said, "Yes, sir, I might have made a mistake.' "

CR Dkt. No. 151, pp. 71-72.

Thus, defense counsel credited Castillo with providing testimony that potentially put his immunity agreement at risk, to say nothing of any clandestine reinstatement agreement. Defense counsel was arguing that the jury should find Castillo's testimony credible because it went against his own personal interests. Given this line of argument, the existence of an express reinstatement agreement would not have undercut Castillo's credibility with the jury, but would seem to bolster it even further.

Given that Pedraza was convicted of the charges relating to misconduct by Vargas, Gomez, and Castillo, the jury clearly found them credible as witnesses. U.S. v. Guerrero, 169 F.3d 933, 939 (5th Cir.1999) (the Court "must accept credibility choices that support the jury's verdict"). In view of the testimony given, it is a matter of pure conjecture to say whether the jury would have found these witnesses less credible if it had known of any implicit or explicit reinstatement agreements. As such, it only raises the possibility of prejudice, rather than demonstrating actual prejudice. See Shaid, 937 F.2d at 235 (the fact that the jury may have misinterpreted the jury instructions on mens rea only raised the

17

possibility of prejudice and did not meet the prejudice prong of the cause and prejudice standard).

Accordingly, Pedraza has not met his burden under the cause and prejudice standard and his petition is procedurally defaulted. In any event, even if the claims are not procedurally defaulted, they do not entitle Pedraza to the relief he seeks.

### B. Reinstatement Agreements

The entirety of Pedraza's claims concerning Vargas, Gomez, Castillo, and Rodriguez is premised upon these agents' reinstatement to their former employment, after Pedraza's trial. In other words, pointing to no evidence – except that the reinstatement happened after the agents testified at Pedraza's trial – Pedraza argues that there must have been an explicit or implicit agreement in place for the agents' cooperation, in exchange for which they would be reinstated in their jobs. Pedraza then argues that, because those purported agreements were never disclosed to the defense or to the jury, the Government violated its obligations under Giglio, 405 U.S. 150.

Pedraza's entire argument rests upon the logical fallacy of post hoc ergo propter hoc. Indeed, the arguments proffered by Pedraza are textbook examples of the logical fallacy. This fatally undermines his claims.

"The post hoc ergo propter hoc fallacy assumes causality from temporal sequence. It literally means 'after this, because of this.' BLACK'S LAW DICTIONARY 1186 (7th ed.1999). It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves a causal relationship." Huss v. Gayden, 571 F.3d 442, 459 (5th Cir. 2009) (quoting McClain v. Metabolife Int'l, *458 Inc., 401 F.3d 1233, 1243 (11th Cir. 2005)). Post hoc ergo propter hoc is not a sound legal or factual basis for relief. Jordan v. Dretke, 416 F.3d 363, 371 (5th Cir. 2005); Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1389, n. 15 (5th Cir. 1996); Tampa Times Co. v. N.L.R.B., 193 F.2d 582, 583 (5th Cir. 1952).

There is no evidence in the record that Vargas, Gomez, Castillo, or Rodriguez had an agreement with the Government that they would be reinstated to their jobs if they cooperated. In fact, Vargas, Gomez, and Castillo all testified under oath that the Department of Justice made no promises to them concerning their employment and that any reinstatement decisions would be made by DHS-OIG. CR Dkt. No. 148, pp. 176-77; CR Dkt. No. 149, pp. 171, 195-97.   As previously pointed out, DHS-OIG was "solely responsible" for the decision to reinstate the agents. Dkt. No. 203-1.  Oosterbaan stated that "no promises were made to, or agreements entered into with" Gomez, Vargas, Castillo, or Rodriguez regarding their employment, as it related to their cooperation with the Government. Id.  This statement is consistent with the testimony given by the agents at trial.  CR Dkt. No. 148, pp. 176-77; CR Dkt. No. 149, pp. 171, 195-97.  Pedraza provides no evidence that these agents perjured themselves.

Rodriguez did not testify and Pedraza speculates that he was told to absent himself from the trial by the Government because "[t]he DOJ attorneys likely knew Rodriguez would never say he was a co-conspirator with Pedraza." Dkt. No. 1, pp. 2-3.  If Pedraza believed that Rodriguez had testimony which would have aided his defense, Pedraza could have called Rodriguez to testify. U.S. v. Soape, 169 F.3d 257, 268 (5th Cir. 1999).  The Government's decision not to call Rodriguez was apparent when the Government rested its case-in-chief. There is no evidence in the record that Pedraza was prevented in any fashion from calling Rodriguez as a witness.  Thus, the failure to call Rodriguez as a witness rests with Pedraza. The Government had no obligation to turn over impeachment evidence for witnesses who do not testify at trial. U.S. v. Valdes, 214 F. App'x 948, 951 (11th Cir. 2007); U.S. v. Mullins, 22 F.3d 1365, 1372 (6th Cir. 1994).  Further, even assuming arguendo that an agreement existed between Rodriguez and the Government, given the fact that Rodriguez was not called as a witness, the prosecution had no obligation to turn over any impeachment evidence to Pedraza.

Moreover, when Rodriguez did not testify, the field was wide open for the defense to call Rodriguez.  The defense's failure to call Rodriguez, according to their own argument, would tend to indicate that Rodriguez's testimony would not be favorable to Pedraza.

Furthermore, the Oosterbaan declaration explicitly states that DHS-OIG was "solely responsible for the decisions to reinstate Special Agents Marco Rodriguez, Rolando Gomez, Robert Vargas and Edwin Castillo" to their former positions and that "[t]he Department of Justice was not consulted regarding these determinations and provided no input in these administrative decisions." CR Dkt. No. 203-1.   As previously and repeatedly noted, Oosterbaan states under oath that DHS-OIG made "no promises" and did not enter into any agreements with Rodriguez, Gomez, Vargas, or Castillo in exchange for their testimony. Id.

In the face of this unequivocal statement, Pedraza proffers semantical arguments. Pedraza argues that while the Department of Justice may not have been "consulted," it still leaves open the possibility that the Department of Justice had been "informed, be that formally, informally, tacitly or implicitly" that the agents were going to be reinstated – despite the fact that DHS-OIG made "no promises" and entered into no agreements with Castillo, Vargas, Gomez, or Rodriguez. Dkt. No. 1, p. 14; CR Dkt. No. 203-1.  In other words, Pedraza is accusing DHS-OIG and the Department of Justice of having a "wink and nod" understanding that the agents would be reinstated and, then, hiding that fact from the defense and the jury.  Despite the significance of this claim, Pedraza offers no evidence to support it, other than semantic gymnastics and logical fallacies.

Furthermore, even if the Court assumes that such agreements existed, the failure to disclose the agreements was harmless error.  Pedraza must show that there is "reasonable probability" that the result at trial would have been different if the jury had known about these agreements. Banks v. Dretke, 540 U.S. 668, 691 (2004); Derden, 192 F.3d 126, *3.  As previously discussed, the jury was well aware that Vargas, Castillo, and Gomez were hopeful that they would be reinstated to their jobs at the conclusion of the case. CR Dkt. No. 148, pp. 176-77; CR Dkt. No. 149, pp. 171, 195-97.  In fact, Pedraza's counsel argued to the jury that

20

these witnesses should not be believed because they had "been bought and paid for," by being allowed to remain on paid leave and were hoping to be reinstated if they testified against Pedraza. Thus, the issue was in front of the jury when it made its credibility determinations. Pedraza has not shown that there is a reasonable probability that the jury would have decided the facts differently, if they had known about any supposed or imagined agreement between the agent witnesses and their employer.

Pedraza's claims are meritless and should be denied.

**C. DHS's Beliefs**

In a final attempt to convince the Court that Pedraza did nothing wrong, Pedraza argues that, because Rodriguez, Vargas, Castillo, and Gomez were all reinstated, that means DHS-OIG concluded that they did not commit a crime and the jury should have been informed of this conclusion. Dkt. No. 1, p. 10. This claim fails because it is not supported by the law.

There is no per se bar on people who have committed criminal conduct from passing a federal suitability determination. Under federal regulations, a suitability determination is done to "protect the integrity" and "promote the efficiency" of the relevant agency. 5 C.F.R. § 731.201. Obviously, this is an amorphous standard.

Federal regulations limit the factors that can be considered in making a suitability determination. 5 C.F.R. § 731.202(b). As relevant here, misconduct in employment and criminal activity are valid factors for the agency to consider in making a suitability determination. Id. The agency, however, must also consider the "nature and seriousness" of the underlying conduct, as well as the "circumstances surrounding the conduct." 5 C.F.R. § 731.202(c). The agency has the "sole discretion" to apply these considerations to whatever extent that it "deems any of them pertinent to the individual case." Id. Notably, the regulation does not limit the discretion of the agency to continue to employ people who commit felonies during their federal service; whether that discretion should exist is not a question properly before the Court.

21

Thus, DHS-OIG could conclude that Rodriguez, Vargas, Castillo, and Gomez engaged in criminal conduct – by creating fabricated records – but that, given the circumstances surrounding their conduct, and their actions when confronted with their conduct, their continued employment would not impugn the integrity of DHS-OIG.  The Court is not saying that Rodriguez, Vargas, Castillo, and Gomez were blameless for their actions.  Indeed, as the Court noted at sentencing, "it's hard to really think of a more serious offense" than altering criminal investigation records, "especially when it's done by someone involved in law enforcement."  CR Dkt. No. 191, pp. 44-45.  Instead, the Court recognizes the discretion vested in DHS-OIG to retain people who committed felonies in their employment.  In short, the agency was not required to find that the agents were legally and factually innocent of a crime in order to reinstate them.  Thus, the argument made by Pedraza is not one dictated by law or even regulation.

The Court further notes that the applicable regulations require the agency to consider the circumstances surrounding the conduct. 5 C.F.R. § 731.202(c).  The fact that, according to their testimony, Vargas, Castillo, and Gomez acted only pursuant to the direct order of their supervisor; played no role in hatching the scheme; and, had no prior history of fabricating records, would surely be considered in evaluating their conduct.  Simply put there is no legal basis to conclude that DHS-OIG necessarily believed that Rodriguez, Vargas, Castillo, and Gomez did not commit a crime simply because DHS-OIG chose to exercise its discretion in reinstating them.[9]

As with his other claims, Pedraza's claims here are meritless and should be denied.

---

[9]  The Court notes, in passing, that Pedraza was assessed a sentencing enhancement for serving as a leader and organizer of the criminal scheme. CR Dkt. No. 155.  The District Judge recognized that Pedraza's actions placed him on a different level of culpability than Castillo, Rodriguez, Vargas or Gomez.  The Sentencing Guidelines reflect that the leadership of a criminal scheme should be treatly more harshly than the subordinates. U.S.S.G. § 3B1.1. DHS-OIG's actions and decisions are consistent with that principle and nothing in the law required DHS-OIG to treat Pedraza identically with his subordinates.

## IV.  Recommendation

WHEREFORE it is recommended that the Petitioner Eugenio Pedraza's Motion to Vacate, Set Aside or Correct his Sentence pursuant to 28 U.S.C. § 2255, Dkt. No. 1, be **DISMISSED** as procedurally defaulted, or alternatively, **DENIED** as meritless.

### A.  Certificate of Appealability

Unless a circuit justice or judge issues a Certificate of Appealability ("COA"), a petitioner may not appeal the denial of a § 2255 motion to the Fifth Circuit. 28 U.S.C. § 2253(a),(c)(1).  A petitioner may receive a COA only if he makes a "substantial showing of the denial of a constitutional right." § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336 (2003).  To satisfy this standard, a petitioner must demonstrate that jurists of reason could disagree with the court's resolution of his constitutional claims or that jurists could conclude that the issues presented are adequate to deserve encouragement to proceed further. Id. at 327; Moreno v. Dretke, 450 F.3d 158, 163 (5th Cir. 2006).  A district court may sua sponte rule on a COA because the court that denies relief to a petitioner is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000).

After reviewing Pedraza's § 2255 motion and the applicable Fifth Circuit precedent, the Court is confident that no outstanding issue would be debatable among jurists of reason.  Although Pedraza's § 2255 motion raises issues that the Court has carefully considered, he fails to make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Accordingly, it is **RECOMMENDED** that a COA should be denied.

### B. Notice to Parties

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. § 636(b)(1) (eff. Dec. 1, 2009).  Failure to timely file objections shall bar the parties from a de novo determination

23

by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court, except upon grounds of plain error or manifest injustice. <u>See</u> § 636(b)(1); <u>Thomas v. Arn</u>, 474 U.S. 140, 149 (1985); <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1428-29 (5th Cir. 1996), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

DONE at Brownsville, Texas, on January 24, 2018.

_____
Ronald G. Morgan
United States Magistrate Judge

24